**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KENYA KENYATTA, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 05-0303 (WHW) |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

**Walls, Senior District Judge**

Plaintiff Kenya Kenyatta seeks review of the final determination of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits and supplemental security income pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  After review, this Court will reverse the Administrative Law Judge's ("ALJ") decision to deny benefits and remand the case to the Commissioner for further proceedings.

**BACKGROUND**

**A.  Procedural History**

Plaintiff applied for supplemental security income ("SSI") payments on February 15, 2000.  (Tr. 30).[1]  On April 3, 2003, after multiple adjudications, he submitted a claim for

---

[1]Page citations are to the transcript of the administrative record filed by the Commissioner as part of her answer.

disability insurance benefits.  (Tr. 15).  Plaintiff alleged that he became disabled on June 2, 1992.  (Tr. 31).  The SSI application was denied initially and upon reconsideration.  (Tr. 30).  At plaintiff's request, a hearing was held to review the application before an ALJ on November 26, 2001.  (Tr. 30).  The ALJ affirmed the decision of the Commissioner on December 12, 2001.  (Tr. 27-34).  On February 22, the Appeals Council granted plaintiff's request for review and remanded the case to the ALJ for further development of the record.  (Tr. 68-69).  A new hearing was held on May 20, 2002, before the ALJ.  (Tr. 348-68).  Vocational expert testimony was taken, and on June 28, 2002, the ALJ found that plaintiff had been under a disability since February 15, 2000.  (Tr. 35-42, 366-68).

On January 8, 2003, the Appeals Council informed plaintiff that it intended to reopen the ALJ's June 28, 2002 opinion pursuant to 20 C.F.R. § 416.1488(c).  (Tr. 85).  The Appeals Council noted that plaintiff had not fully disclosed his true history or work earnings, and that he had been working and earning wages up to the second quarter of 2001.  (Tr. 85).  It remanded the case to a different ALJ for a de novo hearing and decision.  (Tr. 85).  At the hearing on July 10, 2003, plaintiff amended his onset date to March 31, 2002.  (Tr. 371).  Plaintiff later testified, however, that he had worked until September 3, 2002.  (Tr. 375).  That ALJ held supplemental hearings on January 7, 2004 and February 4, 2004.  (Tr. 396-411, 412-16).  On February 20, 2004, the ALJ found that plaintiff was not under a disability.  (Tr. 12-21).  Plaintiff's request for an appeals council review of the determination was denied on November 18, 2004, and the ALJ's decision became the final decision of the Commissioner.  (Tr. 6-8).  Plaintiff timely commenced this action.

**B.  Personal and Employment History**

Plaintiff was born on July 20, 1956 and was forty-five years old at the alleged onset of his disability.[2]  (Tr. 373).  As of the ALJ's most recent decision, plaintiff was forty-seven years old.  (Tr. 15).  Plaintiff obtained a generalized equivalency diploma (GED) in April 1992.  (Tr. 113, 373).  Plaintiff is six feet, four inches tall and weighs approximately 245 pounds.  (Tr. 373).

Plaintiff's past work experience includes employment as a warehouseman, mixer and material handler.  (Tr. 15).  Plaintiff worked as a packer in a sugar company for three-to-four months in 1984-85.  (Tr. 120).  He worked as a driver for a printing company for approximately one year in 1988-89.[3]  (Tr. 120).  In 1995, he worked as a food selector for a food company for five months, and as a floor waxer for three additional weeks.  (Tr. 120).  For approximately six months in 1995-96, plaintiff worked as a truck driver for a wine distributor.  (Tr. 120).

Between March 2000 and June 2000, Plaintiff worked as a die-caster.  (Tr. 309, 351-52).  Plaintiff was sick and unable to work in July 2000 and August 2000, but resumed his duties in September 2000.  (Tr. 352, 355-56).  He was laid off in November 2000.  (Tr. 355-56).  In August, 2001 plaintiff was employed as a mixer and material handler at the Hershey Company (Tr. 356-61).  He left that job in approximately March of 2002.  (Tr. 359).

---

[2]  Plaintiff later amended his onset date to March 31, 2002, although he testified that he last worked in September 2002.  (Tr. 399).

[3]The Commissioner's brief states that plaintiff worked from 1988-95 as a truck driver (Def.'s Br. at 6), but plaintiff's Work History Report reveals that he worked in that capacity for approximately one year in 1988-89 and six months in 1995-96.  (Tr. 120).  This inconsistency may be clarified on remand.

Plaintiff also worked at Wal-Mart for approximately four and a half months from May to September 2002, first in the toy department and then stocking shelves in the produce department. (Tr. 375-76).  Plaintiff testified that he stopped working at Wal-Mart because he was unable to use the hydraulic hand jack to move stock.  (Tr. 377-78).  Between March 2000 and the second quarter of 2002, plaintiff earned just under $20,000.  (Tr. 85).

Plaintiff testified that he can only lift about twenty or twenty-five pounds.  (Tr. 387).  In his employment as a die-caster and material handler, however, he testified that he lifted objects weighing between thirty and fifty pounds.  (Tr. 355, 357).  Plaintiff testified that he does some minor household duties, like watering the lawn, making his bed, mopping the floor, and taking out the garbage.  (Tr. 145, 386).  Plaintiff does not drive because he has a suspended license resulting from speeding tickets, but he does occasionally take the bus.  (Tr. 386).

Rocco J. Meola, a vocational expert, testified at the May 20, 2002 hearing that, based on plaintiff's testimony, "the pain, the inability to stay on the job for periods of time, the frequent dizziness, my opinion, based on that alone, he would not be able to work on a consistent basis in the competitive labor market."  (Tr. 366).  It was later revealed, however, that plaintiff had been substantially gainfully employed for much of the period in question.  (Tr. 85).  The ALJ ultimately determined that the plaintiff retained the ability to work in the national economy.  (Tr. 19).

As part of Social Security's "ticket to work" program, plaintiff took part in a ninety-day computer course and had been able to attend every day at least up to his January 7, 2004 hearing. (Tr. 405).

-4-

**C.  Medical History**

   **1.  Summary of Medical Evidence Before the Alleged Onset Date of Disability**

Plaintiff alleges that he became disabled on March 31, 2002 due to asthma and coronary artery disease.  (Tr. 15).  Plaintiff had been a smoker for over 35 years and had asthma for most of his life.  (Tr. 289, 310).  Plaintiff has been prescribed Proventil for his asthma but has never been hospitalized for it.  (Tr. 31-32).

Plaintiff complained of chest pain at Rahway Hospital on June 29, 2000.  (Tr. 177).  He was discharged on July 1, 2000, with a diagnosis of angina.  (Tr. 175).  On July 31, 2000, Dr. Mathew Cholankeril, a heart specialist, conducted a cardiac catheterization and noted that plaintiff had dilated cardiomyopathy with an ejection fraction of 25-30% with global hypokinesis.[4]  (Tr. 243).  He also noted that plaintiff had moderate coronary disease.  (Tr. 243). Plaintiff was prescribed Digoxin, Accupril, and (later) Coreg.  (Tr. 243, 331).  An echocardiogram on March 28, 2001 recorded an LV ejection fraction of 45% and moderate eccentric left ventricle hypertrophy with apical preponderant hypertrophy.  (Tr. 294).  The echocardiogram revealed mild left ventricular dilation with mildly reduced LV systolic function. (Tr. 294).  On May 17, 2001, plaintiff underwent a nuclear stress test by Dr. Carl Vitale that showed a left ventricular ejection fraction of 42%, a fixed defect involving a portion of the anterior wall, a partially reversible perfusion defect involving the inferior wall, and a fixed apical defect.  (Tr. 298).

_____

   [4]An ejection fraction is defined as "the percentage of the blood in the ventricle actually pumped out with each contraction."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

On April 2, 2001, Dr. Bernard Schanzer noted that plaintiff suffered from migraine syndrome and episodic lightheadedness.  (Tr. 316).  Plaintiff complained of dizziness on June 6, 2001 to Dr. Jeffrey Doskow.  (Tr. 331).  Dr. Doskow recommended he stay off his medications for a few weeks.  (Tr. 331).  On July 30, 2001, plaintiff was evaluated at Trinitas Hospital Department of Psychiatry.  (Tr. 306-14).  In an evaluation dated August 8, 2001, plaintiff was diagnosed with an unspecified depressive disorder, alcohol abuse, and an unspecified personality disorder.  (Tr. 305).  On March 29, 2002, plaintiff complained to Dr. Narendra Patel of generalized weakness with exertional and nonexertional chest pain lasting a few minutes.  (Tr. 318).  Dr. Patel noted that plaintiff had cardiomyopathy with a slightly reduced ejection fraction, and that a cardiac test showed mild inferior wall ischemia.  (Tr. 318).  Dr. Patel's impression was that plaintiff suffered from angina pectoris, malaise, and fatigue, possibly secondary to cardiomyopathy.  (Tr. 318).  She recommended that plaintiff continue his present medications. (Tr. 318).

### 2.  Summary of Medical Evidence After the Alleged Onset Date of Disability

Plaintiff complained of intermittent dizziness and chest pain to Dr. Doskow again on October 4, 2002 and October 15, 2002.  (Tr. 330-31).  On October 10, 2002, plaintiff underwent cardiac stress perfusion testing.  (Tr. 327).  The testing was positive for ischemia and LV dysfunction.  (Tr. 327).  The stress test showed an ejection fraction of 40%, and perfusion images revealed a dilated left ventricalular cavity.  (Tr. 327).  The perfusion images also revealed some redistribution of the inferior wall and apical thickness which may be indicative of myocardial ischemia.  (Tr. 327).  Cardiac catheterization on October 21, 2002 showed an ejection fraction of

30%.  (Tr. 328).  A coronary angiogram showed no disease in any of the coronary arteries.  (Tr. 328).  Dr. Doskow's impression was of nonischemic cardiomyopathy.  (Tr. 328).

Plaintiff was admitted to St. Michael's Hospital on April 28, 2003 with complaints of chest pain.  (Tr. 339).  Chest x-rays showed no active disease.  (Tr. 347).  Plaintiff's blood pressure was 142/79 and his pulse 73.  (Tr. 17).  The impression on his chart on April 29, 2003 was of atypical chest pain and nonischemic cardiomyopathy.  (Tr. 17).  An EGD procedure on April 30, 2003 showed evidence of duodenitis and acute gastritis in his stomach.  (Tr. 345).  Plaintiff was discharged on April 30, 2003, with a recommendation to continue his current medications.  (Tr. 341, 345).

Plaintiff testified at the January 7, 2004 hearing in front of the ALJ.  Plaintiff's medications at that point were Naproxyn (back pain), Furosemide (water pill), Coreg (heart), Enalapril (blood pressure), and Advair (asthma).  (Tr. 401-02).  Plaintiff testified that he was unable to work as a result of chest pain, lightheadedness and a breathing problem, and that he became lightheaded three to four times a week.  (Tr. 402-03).

Dr. Donald Peyser, a specialist in internal medicine and cardiovascular disease, testified at the January 7, 2004 hearing.  (Tr. 407-11).  Dr. Peyser opined that plaintiff had "heart problems" and that his ejection fraction varied from 30% to 45%, depending on the technique used and the time of the test.  (Tr. 407).  Dr. Peyser also noted that the conclusion of most of plaintiff's doctors was that plaintiff had some sort of a cardiomyopathy which gave him some decrease in his ejection fraction performance, but it was not due to ischemia.  (Tr. 408).

Dr. Peyser then noted that Dr. Schanzer, a neurologist who examined plaintiff, talked about the possibility of some migraine syndrome that might be related to plaintiff's headaches and dizziness.  (Tr. 316, 408).  The neurologist, however, was unable to find any vascular reason for plaintiff's dizziness after conducting a complete neurological examination.  (Tr. 316, 408).  Dr. Peyser related that plaintiff had a history of mild asthma, but there was nothing to suggest it was of an acute nature or that it was not reversible with medication.  (Tr. 408).  He noted that plaintiff's pulmonary function studies, undertaken in 2000, came back normal.  (Tr. 408).  Dr. Peyser finally stated that while plaintiff suffered from some anxiety and depression in the past, he had received some counseling.  (Tr. 354, 408).

Based on this information, Dr. Peyser opined that plaintiff's impairment would not meet or equal a listing.[5]  (Tr. 408).  He noted that plaintiff could not return to his past work as a laborer but certainly could do sedentary work and possibly some light work.  (Tr. 409).  Dr. Peyser further opined that plaintiff's medications were extremely appropriate and that plaintiff was "pretty stable" at the time of the hearing.  (Tr. 409).  Dr. Peyser stated that restrictions in terms of dust and perhaps cold and heat would be appropriate non-extertional restrictions in light of plaintiff's asthma.  (Tr. 409).  In "an abundance of caution," Dr. Peyser stated that plaintiff should not climb ladders or work on scaffolding due to his complaints of dizziness and lightheadedness.  (Tr. 409-410).

---

[5]The Commissioner has promulgated a number of listed impairments that she acknowledges are so severe as to preclude substantial gainful activity.  See Bowen v. Yuckert, 482 U.S. 137, 141 (1987).  "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."  Id.; see also 20 C.F.R. §§ 404.1520(d), 416.920(d).

Dr. Peyser testified again at the February 4, 2004 hearing based on newly submitted medical evidence of plaintiff's admission to St. Michael's Hospital for chest pain.  (Tr. 414-15). Dr. Peyser noted that plaintiff's doctors believed his chest pain to be related to acute gastritis rather than a cardiac problem.  (Tr. 415).  Dr. Peyser concluded that plaintiff had non-ischemic cardiomyopathy but could still perform sedentary work.  (Tr. 415).

**STANDARDS**

**A.  Standard of Review**

This Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).  The district court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  While substantial evidence must have real probative weight it "may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988)).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'"  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)). Cursory conclusions unsupported by evidence cannot justify an ALJ's decision.  Id.  "[A]

-9-

reviewing court may remand a case to the Secretary for good cause, 'where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits.'" Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979) (quoting Saldana v. Weinberger, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)).

In determining if there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) objective medical facts; (2) diagnoses and expert opinions of examining physicians; (3) subjective evidence of pain; and (4) the claimant's educational background, work history and age." Snee v. Sec'y of Health and Human Servs., 660 F. Supp 736, 738 (D.N.J. 1987). Accord Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972). In order for this Court to properly conduct judicial review and to avoid "judicial usurpation of administrative functions" it must ensure that the "administrative decision. . .[is] accompanied by a clear and satisfactory explanation of the basis on which it rests." Cotter v. Roberts, 642 F.2d 700, 704-5 (3d Cir. 1981). Otherwise, remand is appropriate.

**B.  Standard for the Commissioner's Determination of Disability**

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). The Social Security Act (the "Act") provides that:

> [an individual] shall be determined to be under disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

"In accordance with authority granted under 42 U.S.C. § 405(a), the Commissioner has promulgated the regulations applied by the ALJ to give effect to, and further define the provisions of the Act." Knepp, 204 F.3d at 83. The regulations provide for a five-step evaluation of an individual's claim for disability and supplemental security income benefits. See Sullivan v. Zebley, 493 U.S. 521, 525 (1990); see also Knepp, 204 F.3d at 83; Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431-32 (3d Cir. 1999).

In step one, the ALJ must determine whether the claimant currently engages in substantial gainful activity. 20 C.F.R. §§ 404.1520(a); 416.972; see also Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). "Substantial gainful activity" is defined as "the performance of significant physical or mental duties. . .for remuneration or profit." Chicager v. Califano, 574 F.2d 161, 163 (3d Cir. 1978). If the claimant is not engaged in substantial gainful activity, the claim analysis proceeds to step two.

In step two, the ALJ determines whether the claimant suffers from a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982). A severe impairment is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." Barnhart v. Thomas, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(c), 416.920(c). The burden

-11-

is on the claimant to prove that his impairments are sufficiently severe to satisfy the standard.
See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987).

In step three, the ALJ must determine "whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141. "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." Id.; see also 20 C.F.R. §§ 404.1520(d), 416.920(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five, where the ALJ "must determine whether the claimant retains the ability to perform either his former work or some less demanding employment." Heckler v. Campbell, 461 U.S. 458, 460 (1983).

In step four, the claimant must establish that he or she lacks the "residual functional capacity" to return to his or her former work. 20 C.F.R. § 404.1520(e); see also Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000). "Residual functional capacity" is defined as what the claimant "can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a). An ALJ must evaluate the physical and mental requirements of the claimant's past work experience to determine residual functional capacity. See 20 C.F.R. § 404.1520(e); see also Knepp, 204 F.3d at 82. If the claimant can meet his or her past work demands, then he or she is not disabled within the meaning of the Act. See Yuckert, 482 U.S. at 141. If claimant establishes he or she lacks the residual functional capacity to do his or her past work, the analysis moves to step five.

In step five, the Commissioner must show that the claimant, given his or her age, education, and work experience, has the capacity to perform specific jobs that exist in the national economy.  See 20 C.F.R. §§ 404.1520(f), 416.920(f); 404.1560(c).  The Commissioner may rely on medical-vocational guidelines, commonly known as "grids," such as those contained in 20 C.F.R. Pt. 404, Sub. P, App. 2, for purposes of establishing whether a sufficient number of jobs exist for a person with claimant's diminished capacity.  See Campbell, 461 U.S. at 460. Plaintiff bears the burden of proof for the first four steps of the analysis, and the Commissioner bears the burden for the fifth step.  See Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).

**ANALYSIS**

At step one of the analysis, the ALJ concluded that further development of the record was needed to determine if plaintiff's wages after March 31, 2002 represented substantial gainful activity.[6]  (Tr. 16).  At the January 7, 2002 hearing, plaintiff testified that he had been employed by Wal-Mart until September 2, 2002, five months past his alleged onset date.  (Tr. 399) Nevertheless, the ALJ continued on his analysis.   In step two, the ALJ found that the medical evidence indicated that plaintiff has cardiomyopathy and asthma, impairments that qualify as "severe."  (Tr. 17).  At the third step of the analysis, however, the ALJ found that none of plaintiff's impairments (either alone or in combination) satisfied or equaled the clinical criteria listed in Appendix 1 of the regulations.  (Tr. 17).  The ALJ noted that Appendix 1, Subpart P,

---

[6] The factual determination of when plaintiff ceased to engage in substantial gainful activity is appropriately considered on remand.

Regulation No. 4, Listing 4.02 requires both an ejection fraction of 30% *and* other physical symptoms, such as high blood pressure or inadequate cerebral perfusion.  (Tr. 17).  The ALJ found it "questionable" that claimant's ejection fraction is as low as 30%.  (Tr. 17).  He also found that plaintiff did not demonstrate evidence of additional symptoms.  (Tr. 17).  Because plaintiff's impairments did not meet or equal the criteria listed in appendix 1, a determination of per se disability was not merited.  See 20 C.F.R. Pt. 404, Sub. P, App. 1.

The analysis then proceeded to step four, where the ALJ found that plaintiff had established that he lacked the "residual functional capacity" to perform his "past relevant work." (Tr. 18).  At the fifth step, the ALJ found that the plaintiff retained the residual functional capacity to do sedentary work that did not require concentrated exposure to fumes, odors, dusts, gases, extreme heat or cold, or frequent climbing of ladders, ropes or scaffolds.  (Tr. 18).  As a result of this finding, the ALJ determined that plaintiff has the exertional capacity to perform substantially all of the requirements of sedentary work.  (Tr. 19).  The ALJ then consulted the grids.  (Tr. 19).  He concluded that the plaintiff was capable of performing a sufficient number of jobs within the national economy.  (Tr. 19).

Plaintiff challenges the ALJ's decision on grounds that the decision was not based upon substantial evidence of record.  (Pl.'s Br. at 5).  Plaintiff specifically alleges that the Commissioner did not satisfy her burden at the fifth step of the sequential evaluation.  (Pl.'s Br. at 13).

**A. The ALJ's Determination that Plaintiff Could Do Sedentary Work was Supported by Substantial Evidence**

Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairments.  20 C.F.R. §§ 404.1545(a), 416. 945; see Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (citing Hartranft v. Apfel, 181 F.3d 358, 359 n. 1 (3d Cir.1999)).  Determination of a claimant's residual functional capacity is the exclusive responsibility of the ALJ.  20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), and 416.946.

There is substantial evidence in the record to support the Commissioner's decision that the plaintiff retains the residual functional capacity for sedentary work, coupled with non-exertional restrictions against exposure to dust, fumes and extreme temperatures.  (Tr. 18). In determining if there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) objective medical facts; (2) diagnoses and expert opinions of examining physicians; (3) subjective evidence of pain; and (4) the claimant's educational background, work history and age."  Snee v. Sec'y of Health and Human Servs., 660 F. Supp 736, 738 (D.N.J. 1987).  Accord Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972).

The ALJ found for plaintiff on steps two and four, and the plaintiff does not challenge his finding.  Similarly, plaintiff does not appear to challenge the ALJ's determination at step three of the analysis that the plaintiff does not meet or equal a listing pursuant to 20 C.F.R. § 404.1520(d).  (Pl.'s Br. at 11) (noting that "the cardiologist's opinion must rule the day.")  To the extent–if any–plaintiff disputes the ALJ's finding that plaintiff could do sedentary work, the argument is ultimately unpersuasive.  The record contains substantial evidence to support the

ALJ's determination.  First, "it is questionable that claimant's ejection fraction is as low as 30%."  (Tr. 17).  Cardiac catheterizations taken on July 31, 2000 and October 21, 2002 did show an ejection fraction range of 25-30%, but echocardiograms from substantially the same period showed ranges of 40%, 42%, and 45%.  (Tr. 243, 294, 298, 327, 328).  The ALJ discusses plaintiff's various ejection fraction values and notes that "most doctors concluded that [plaintiff] has cardiomyopathy with some decrease in ejection fraction."  (Tr. 17).  Plaintiff bears the burden at this step and it cannot be said that the conclusion reached by the ALJ was not "rational."  Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Second, plaintiff would be unable to meet his burden at the third step of the analysis even if he could prove conclusively that he had an ejection fraction of 30%.  As the ALJ noted, plaintiff must satisfy additional requirements in addition to the requisite ejection fraction under 4.02 to meet or equal a listing.  (Tr. 17); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Plaintiff must also demonstrate one of the following: (1) persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living; (2) three or more separate episodes of congestive heart failure within a consecutive 12-month period; or (3) inability to perform an exercise tolerance test at a workload equivalent to 5 METs or less, with other corresponding ailments.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  As the ALJ noted, the record does not contain evidence that would satisfy any of the three requirements.  (Tr. 17).  The ALJ found that plaintiff's "blood pressure is stable, he does not have signs attributable to inadequate cerebral perfusion such as an ataxic gait or mental confusion and he does not have a

marked limitation of physical activity." (Tr. 17). Plaintiff carries the burden at this stage of the

analysis and, as the ALJ notes, he did not make his requisite showing of proof. (Tr. 15-21).

## B. The ALJ Improperly Relied on the Medical-Vocational Guidelines Exclusively at Step Five of the Analysis.

Plaintiff argues that the Commissioner did not satisfy her burden at the fifth step of the

analysis. (Pl.'s Br. 13-17). Specifically, plaintiff contends that because he has both exertional

and nonexertional restrictions, it was improper for the ALJ to rely on the medical-vocational

guidelines ("grids") at step five of the analysis. (Pl.'s Br. 13). Under the regulations,

impairments are classified as exertional if they affect a claimant's ability to meet the strength

demand of jobs. Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2005); 20 C.F.R. § 404.1569a

(1999). The U.S. Department of Labor classifies jobs by various exertional levels, ranging from

"sedentary" to "very heavy," in terms of the strength demands for sitting, standing, walking,

lifting, carrying, pushing and pulling. Id. A nonexertional impairment is one which is medically

determinable and causes a nonexertional limitation of function or an environmental restriction.

S.S. R. 85-15, 1985 WL 56857, at *2 (1985). In his opinion, the ALJ found that the plaintiff

retained the ability to do sedentary work but had nonexertional restrictions against concentrated

exposure to fumes, odors, dusts, gases, extreme heat or cold or frequent climbing of ladders,

ropes or scaffolds. (Tr. 20).

Plaintiff's argument has merit. As the ALJ himself noted, "Medical- Vocational

Guidelines may be used to direct an unfavorable decision *only* if...there are no nonexertional

limitations" (emphasis added). (Tr. 19). The Third Circuit has expressly forbidden ALJs from

mechanically applying the grids where both exertional and nonexertional limitations are present:

-17-

>In the absence of a rulemaking establishing the fact of an undiminished occupational base, the Commissioner cannot determine that a claimant's nonexertional impairments do not significantly erode his occupational base under the medical-vocational guidelines without either taking additional vocational evidence establishing as much or providing notice to the claimant of his intention to take official notice of this fact (and providing the claimant with an opportunity to counter the conclusion).

Sykes, 228 F.3d at 261 (citing Heckler v. Campbell, 461 U.S. 458 (1983)).

In this case, the ALJ engaged in precisely the conduct the Sykes court sought to prevent.[7]

Id. at 270.  After discussing plaintiffs exertional and nonexertional restrictions, the ALJ simply

opined that plaintiff could perform "substantially all of the requirements of sedentary work."  (Tr.

17-19).  The ALJ then applied the grids as a "framework" and denied plaintiff's application.

(Tr.19).  This was error.  After finding that plaintiff had both exertional and nonexertional

restrictions, the ALJ had two clear options open to him.  Id. at 261; see also Soc. Sec.

Acquiescence Ruling 01-1(3), 2001 WL 65745, at *4 (2001).  First, he could have consulted a

treatise or taken vocational expert testimony that evaluated plaintiff's ability to function in the

workplace with his particular limitations.[8]  See Sykes, 228 F.3d at 269.  Second, the ALJ could

have notified the claimant of his intention to take administrative notice that plaintiff's

impairments did not significantly erode his occupational base.  Id.  Had the ALJ taken this path,

---

[7]Sykes is hardly alone in this respect.  See Burnham v. Schweiker, 682 F.2d 456, 458 (3d Cir. 1982) (holding that the Commissioner cannot rely exclusively on the grids when the claimant has both exertional and nonexertional impairments); Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1155 (3d Cir. 1983) (same).

[8]While vocational expert testimony was taken on May 20, 2002, the testimony did not address plaintiff's ability to do sedentary work with his nonexertional restrictions.  (Tr. 366-67).  Further, the expert concluded that, based on plaintiff's alleged ailments, plaintiff would *not* be able to work on a consistent basis in the competitive labor market.  (Tr. 366).

he would have been required to give the claimant advance notice of his intention and an opportunity to respond.  Id.  The ALJ, however, did none of these things.  See Melvin v. Comm'r of Soc. Sec., 2007 WL 625580 at *3 (3d Cir. 2007).   There is no indication in the record that the ALJ consulted a treatise, took additional vocational testimony, or took administrative notice of relevant facts.  (Tr. 17-21); see id.

The ALJ also had a third possibility open to him: application of a Social Security Ruling ("SSR").[9]  At the time of the ALJ's decision, it was an open question in this Circuit whether an SSR constituted a "rulemaking establishing the fact of an undiminished occupational base" as provided in Sykes.  228 F.3d at 271.   In Allen v. Barnhart, the Third Circuit recently considered whether an SSR constitutes a "rulemaking" in the same sense as the medical-vocational guidelines.  417 F.3d 396, 402 (3d Cir. 2005); see also Sykes, 228 F.3d at 271 n.14.  In its analysis, Allen noted that the Supreme Court had "established a general rule that the Agency may rely on rulemaking authority to determine issues that do not require case-by-case consideration." 417 F.3d at 402 (citing Heckler v. Campbell, 461 U.S. 458 (1983)).  The Allen court also found it significant that the Agency had issued an Acquiescence Ruling approving of the Sykes decision and the use of SSR's in the context of disability benefit claims.  See Allen 417 F.3d at 404; AR 01-1(3), 2001WL 65745 at *4 (S.S.A.).

---

[9]  "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration." Sullivan v. Zebley, 493 U.S. 521, 531 n. 9 (1990) (internal quotations omitted). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same. A ruling may be superseded, modified, or revoked by later legislation, regulations, court decisions or rulings."  Heckler v. Edwards, 465 U.S. 870, 874 n. 3 (1984) (internal quotations omitted).

From that background, the Third Circuit adopted a bright-line rule permitting ALJ's to rely on SSR's in concert with the medical-vocational guidelines. 417 F.3d at 404. As the Circuit Court explained, "the ALJ's use of the guidelines as a framework.. . .and his reliance upon an SSR at Step 5. . .is not an improper application of either the case law or rules established by the agency." Id. As a matter of fairness, however, if an ALJ seeks to rely on the rules "as a substitute for individualized determination, and thus relieve the agency from the burden of producing evidence, we think advance notice should be given." Id. at 407. The court was clear that claimants also retain the ability to call their own experts to challenge the ALJ's use of an SSR. Id.

In her brief, the Commissioner argues that SSR's 96-9p[10] and 85-15 establish that plaintiff's occupational base was not significantly eroded by his nonexertional restrictions. (Def.'s Br. at 15-16). This determination is irrelevant, however, because the ALJ did not cite to either SSR in his opinion. (Tr. 15-21). The Commissioner may not raise it after the fact. See Sykes, 228 F.3d at 271 ("We do not decide whether Social Security Rulings can serve the same function as the rulemaking upheld in Campbell, for the ALJ did not attempt to rely on these rulings to support the conclusion that [plaintiff's impairment] does not significantly erode the occupational base for light work") (citing Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 88 (1943)). Further, as the Third Circuit recently held in Allen, ALJ's seeking to deny a claimant disability benefits may not "ambush" them with an SSR without providing the claimant notice and an opportunity to respond. 417 F.3d at 407-08.

--------

[10] The Commissioner repeatedly cites the regulation as 96-6p in her brief.

Here, the ALJ simply and inadequately stated that plaintiff could perform "substantially all of the requirements of sedentary work," applied the grids, and denied plaintiffs application. (Tr. 17-19).  The ALJ did not cite to any appropriate regulation or ruling, take vocational expert testimony, consult a treatise, or take administrative notice of facts showing that plaintiff's occupational job base was not diminished by his nonexertional restrictions.  (Tr. 17-19).  The ALJ's ruling is inconsistent with the approach required in this Circuit and must be vacated.  See Sykes, 228 F.3d at 270 ("The practice of the ALJ determining without taking additional evidence the effect of the nonexertional impairment on residual functional capacity cannot stand.")

On remand, the ALJ should adhere to the Sykes and Allen holdings in assessing plaintiff's ability to find other work in the national economy.  If the ALJ chooses to rely on an SSR, he must display the requisite level of specificity and adhere to the notice requirements.  See Allen, 417 F.3d at 406 (stating that "there must be a 'fit' between the facts of a given case...and the way in which the Rule dictates that such nonexertional limitations impact the [occupational] base.").  On remand, the ALJ should also determine when plaintiff is eligible for Social Security benefits, taking into account his September 2002 end-work date and his amended onset date of March 31, 2002.

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion.

___s/William H. Walls_____
United States Senior District Judge

-21-